### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **RUTH E. CROWLEY, as personal** | ) | |
| **representative of the Estate of** | ) | |
| **Justin Crowley-Smilek, et al.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **No.  2:13-cv-442-JHR** |
| | ) | |
| **RYAN ROSIE, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### MEMORANDUM DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT[1]

Both sides in this action alleging the use of excessive force and violation of Maine civil rights and wrongful death statutes have moved for summary judgment.  I grant the defendants' motion in part and deny that of the plaintiffs.

### I.   Applicable Legal Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id*.; *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'"  *Johnson v. University of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522

---

[1] The parties have consented to have me preside over all proceedings in this matter, including the entry of judgment. ECF No. 18.

F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation."  *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Johnson,* 714 F.3d at 52.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc.,* 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id.* (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.*  Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.  As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails

to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

The following facts are undisputed, unless otherwise noted, and are properly supported in the parties' respective statements of material facts.

Defendant Ryan Rosie is a police officer for the Town of Farmington, Maine. Plaintiffs' Local Rule 56 Statement of Material Facts ("Plaintiffs' SMF") (ECF No. 45) ¶ 1; Defendants' Opposition to the Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Defendants' Responsive SMF") (ECF No. 54) ¶ 1. Defendant Jack Peck is the chief of the Farmington Police Department, responsible for the training of the officers within the department and providing policies and procedures on the use of force.  *Id.* ¶¶ 2-3.  The other defendant is the Town of Farmington.  Amended Complaint (ECF No. 29) ¶ 6.

Rosie was hired by the Farmington Police Department on June 14, 2011.  Plaintiffs' SMF ¶ 6; Defendants' Responsive SMF ¶ 6.  He then participated in the department's field training program, which is a minimum eight-week ride-along program where the new officer is graded by a field training officer.  *Id.* ¶ 7.  Any candidate for the position of police officer in the Farmington Police Department must have completed a 100-hour pre-service school through the Maine Criminal Justice Academy, the Alert Test, which is another test through the Maine Criminal Justice Academy, and a physical agility test.  Defendants' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Defendants' SMF") (ECF No. 48) ¶¶ 91-93; Plaintiffs' Opposing Statement of Material Facts & Additional Statement of

Material[] Facts in Opposition to the Defendants' Motion for Summary Judgment ("Plaintiffs' Responsive SMF") (ECF No. 52) ¶¶ 91-93.  Rosie had passed these requirements before he became an officer.  *Id*. ¶ 97.

Peck reviews the field training materials and evaluations before a new officer is deemed to have completed his or her training.  Plaintiffs' SMF ¶ 8; Defendants' Responsive SMF ¶ 8.  Upon finishing training, an officer works alone, without a partner.  *Id*. ¶ 9. The Farmington Police Department does not provide training to its officers on dealing with emotionally disturbed persons, outside of the field training program.  *Id*. ¶ 45.

The Maine Criminal Justice Academy offers an 18-week training school for police officers known as the Basic Law Enforcement Training Program.  *Id*. ¶ 11.  Peck is aware that the training received in the Basic Law Enforcement Training Program is different from the field training provided by the Farmington Police department.  *Id*. ¶ 13.  Rosie was scheduled to attend the January 2012 Basic Law Enforcement Training Program.  *Id*. ¶ 16.

During field training, an officer's skills in a particular area are rated by his or her field training officer as "superior," "acceptable," or "not acceptable" in daily observation reports. *Id*. ¶ 18.  Over the course of his field training, Rosie received several marks of "not acceptable" on his daily observation reports, including "not acceptable" marks in the area of field performance stress conditions on four days, and on three days in the area of orientation skills under stress.  *Id*. ¶¶ 21, 24, 25, 28, 29, 33, 34.

The Six Week Review for Rosie's field training noted several areas of concern, including difficulties with voice command.  *Id*. ¶ 36.  The report recommended remedial training

in this regard with dismissal to follow if the remedial training was unsuccessful.  *Id.*  Rosie's training was extended by two weeks.  *Id.* ¶ 39.[2]

Peck, the field training officers, and the deputy chief met in August 2011 to decide whether to end Rosie's training period and hire him.  *Id.* ¶ 41.  There was no discussion of Rosie's field performance under stressful conditions.  *Id.* ¶ 43.  Rosie's training period was ended and he was hired as a full-time officer.  *Id.* ¶ 44.  Rosie did not receive any training in dealing with emotionally disturbed or suicidal persons, other than two situations encountered during his field training.  *Id.* ¶ 50.

On the morning of November 19, 2011, Rosie was working at the Farmington Police Department.  *Id.* ¶ 54.  Officer Ted Neil arrived for his shift at the Farmington Police Department at around 11:00 a.m.  *Id.* ¶ 55.  Soon after Neil arrived, a buzzer went off indicating that someone was outside one of the entrances to the building.  *Id.* ¶ 57.  Rosie and Neil checked the entrances but did not find anyone waiting outside.  *Id.* ¶ 58.

The buzzer went off a second time, and the officers' inspection of the entrances yielded the same result.  *Id.* ¶ 59.  Rosie then received a telephone call from dispatch informing him that someone outside the building wanted to speak to an officer.  *Id.* ¶ 60.  He went to the front entrance but did not see anyone outside.  *Id.* ¶ 61.  He then stepped out of the building into the parking lot and noticed a person walking away from the building down Route 2.  *Id.* ¶ 62.  Rosie assumed that this was the person who had pressed the buzzer and called out, "Can I help you?"  *Id.* ¶ 64.  The person did not respond, so Rosie yelled louder.  *Id.* ¶ 65.

The person then turned around and started walking toward Rosie, who did not recognize him.  *Id.*  ¶¶ 66-67.  Rosie learned later that the person was Justin Crowley-Smilek.

---

[2] My recitation incorporates the defendants' qualification.

*Id*. ¶ 68  Crowley-Smilek's hands were in his jacket pockets as he walked back toward the police station.  *Id*. ¶ 70.  He did not say anything.  *Id*. ¶ 69.  Rosie began walking toward Crowley-Smilek and tried to engage him in conversation.  *Id*. ¶¶ 72-73.  Crowley-Smilek did not respond. *Id*. ¶ 74.

Rosie said to Crowley-Smilek, "You are making me nervous.  Take your hands out of your pockets."  *Id*. ¶ 75.  Crowley-Smilek did not respond and kept walking toward Rosie at a fast pace.  *Id*. ¶¶ 76, 81.[3]  Rosie moved to the front driver's side of his cruiser, which was parked in front of the police department.  *Id*. ¶ 80.  Crowley-Smilek walked to the rear of the cruiser on the passenger side.  *Id*. ¶ 82.  His hands were still in his jacket pockets.  *Id*. ¶ 83.

Crowley-Smilek then took a knife out of his left jacket pocket.  *Id*. ¶ 85.  He held it in his left hand.  *Id*. ¶ 86.  The knife was 13 inches long, with an eight-inch blade and a five-inch handle.  Defendants' Additional Statement of Material Facts ("Defendants' Additional SMF") (included in Defendants' Responsive SMF, beginning at 10) ¶ 2; Plaintiffs' Local Rule 56 Reply Statement of Material Facts ("Plaintiffs' Reply SMF") (ECF No. 55) ¶ 2.  Rosie drew his service firearm and asked, "What the f--- you doing?"  Plaintiffs' SMF ¶ 87; Defendants' Responsive SMF ¶ 87.[4]  Crowley-Smilek responded, "You better kill me now."  *Id*. ¶ 88.  He started to run around the cruiser in the direction of Rosie.  *Id*. ¶ 91.[5]  Rosie, moving in the opposite direction around the cruiser, called "10-74" on his radio.  *Id*. ¶¶ 92-93.  A "10-74" call is a call for emergency officer assistance that will call out "everybody available."  *Id*. ¶¶ 94-95.  Rosie provided dispatch with his location, and expected Neil to respond to the call for assistance.  *Id*.

---

[3] The defendants' qualification of paragraph 81 of the plaintiffs' statement of material facts, Defendants' Responsive SMF ¶ 81, has no bearing on my decision and is not inconsistent with this sentence in the text.
[4] The defendants' qualification of this paragraph of the plaintiffs' statement of material facts, Defendants' Responsive SMF ¶ 87, has no bearing on my decision and is not inconsistent with this sentence in the text.
[5] My recitation incorporates the defendants' qualification.

¶¶ 98, 100.  As he called dispatch, Rosie took out his taser, but immediately rejected the option of using it.  *Id*. ¶¶ 101-02.

Rosie put his taser back immediately because he knew that the taser was not the appropriate tool because he believed that he was being confronted with a threat of deadly force, and the taser is categorized as non-deadly force.  Defendants' SMF ¶¶ 47-48; Plaintiffs' Responsive SMF ¶¶ 47-48.

Crowley-Smilek continued to move back and forth on the passenger side of the cruiser, and Rosie moved around the cruiser to keep the cruiser between him and Crowley-Smilek.  Plaintiffs' SMF ¶¶ 103-04; Defendants' Responsive SMF ¶¶ 103-04.  At some point, Crowley-Smilek said twice, "You better kill me."  *Id*. ¶ 105. Rosie took these statements as a threat against him.  Defendants' SMF ¶ 57; Plaintiffs' Responsive SMF ¶ 57.  When Crowley-Smilek was at the back end of the cruiser, Rosie chose to move out away from the cruiser to take up a firing position.  Plaintiffs' SMF ¶¶ 110-11; Defendants' Responsive SMF ¶¶ 110-11.  Rosie could see Crowley-Smilek's "entire body" as he came around the back of the cruiser toward Rosie.  *Id*. ¶ 113.

Crowley-Smilek began sprinting toward Rosie.  Defendants' SMF ¶ 61; Plaintiffs' Responsive SMF ¶ 61.  As Crowley-Smilek ran toward Rosie, Rosie fired his service weapon repeatedly at Crowley-Smilek.  *Id*. ¶ 62.  Rosie recalls firing five shots at Crowley-Smilek. Plaintiffs' SMF ¶ 122; Defendants' Responsive SMF ¶ 122.  While prone on the ground, Crowley-Smilek said to Rosie, "Kill me."  Defendants' SMF ¶ 68; Plaintiffs' Responsive SMF ¶ 68.  Rosie was circling Crowley-Smilek and yelled, "Do you have any more weapons?" because Crowley-Smilek's left arm was underneath his abdomen.  Rosie reached down and took

Crowley-Smilek's left arm out from underneath him to ensure that there were no more weapons. *Id.* ¶ 71.

Rosie radioed dispatch, stating: "Subject down," and responded affirmatively when asked whether an ambulance was needed. *Id.* ¶¶ 72-73. Rosie then re-holstered his weapon, as Neil came out of the front entrance of the municipal building. *Id.* ¶ 74.

The state medical examiner found upon autopsy that Crowley-Smilek died as the result of several gunshot wounds. Plaintiffs' SMF ¶ 140; Defendants' Responsive SMF ¶ 140. There was a graze wound to the back of his neck and an entry wound over the right back shoulder. *Id.* ¶¶ 142-43. Seven shots were fired, five of which struck Crowley-Smilek. Defendants' SMF ¶ 75; Plaintiffs' Responsive SMF ¶ 75.

Leon Heckbert owns a service station down the street from the municipal building. Plaintiffs' SMF ¶ 145; Defendants' Responsive SMF ¶ 145.[6] He was working there on November 19, 2011. *Id.* Heckbert was putting air into a customer's car tires when he heard four gunshots. *Id.* ¶ 146.[7] He then stood up and "saw the police car parked in front of the municipal building here and the officer pointing to the ground." *Id.* ¶ 147.[8] Heckbert was about 200 yards away from the municipal building when he looked up and saw the officer. *Id.* ¶ 149. He could not see what the officer was pointing at on the ground because the cruiser was blocking his view. *Id.* ¶ 153.

Heckbert saw Rosie shoot again at a downward angle, move a couple of steps, and shoot Crowley-Smilek one more time. Defendants' Additional SMF ¶ 14; Plaintiffs' Reply SMF

---

[6] The defendants' qualification of this paragraph of the plaintiffs' statement of material facts, Defendants' Responsive SMF ¶ 145, has no bearing on my recommended decision and is not inconsistent with this sentence in the text.
[7] The defendants' qualification of this paragraph of the plaintiffs' statement of material facts, Defendants' Responsive SMF ¶ 146, has no bearing on my decision and is not inconsistent with this sentence in the text.
[8] The defendants' purported denial of this paragraph of the plaintiffs' statement of material facts, Defendants' Responsive SMF ¶ 147, does not address the substance of this paragraph, and, accordingly, the paragraph is deemed admitted.

¶ 14.  Heckbert ran down the street to the building directly across from the municipal building and saw a person lying on the ground.  Plaintiffs' SMF ¶ 159; Defendants' Responsive SMF ¶ 159.  He could hear the person breathing "kind of like choking" from across the street.  *Id.* ¶ 160.

The use of force policy for the Farmington Police Department in effect on November 19, 2011, provided: "An officer is justified in using deadly force only when the officer reasonably believes such force is necessary: For self-defense . . . from what the officer reasonably believes is the imminent use of unlawful deadly force[.]"  *Id.* ¶ 164.  Rosie's actions in regard to the threat posed by Crowley-Smilek on November 19, 2011, were consistent with his training and consistent with the Farmington Police Department's policies and procedures.  Defendants' SMF ¶ 78; Plaintiffs' Responsive SMF ¶ 78.

Peck is unaware of any lawsuit, other than the instant action, ever filed against the Town of Farmington alleging excessive and/or unreasonable use of force.  Defendants' Additional SMF ¶ 20; Plaintiffs' Reply SMF ¶ 20.  Other than this action, Peck has never had a civil complaint initiated against him.  *Id.* ¶ 21.

The Maine Attorney General issued a report on May 14, 2012, after conducting an investigation into Rosie's use of deadly force, and concluded that at the time Rosie fired his weapon at Crowley-Smilek, it was reasonable for Rosie to believe that he was subject to a threat of imminent deadly force and that it was reasonable for him to use deadly force to protect himself from that threat.  Defendants' SMF ¶ 87; Plaintiffs' Responsive SMF ¶ 87.[9]

---

[9] The plaintiffs admit "as to the findings reached by [the] Attorney General report" but deny and object to this paragraph of the defendants' statement of material facts "as to basis of opinions, legal conclusions, and facts stated within the report." Plaintiffs' Responsive SMF ¶ 87.  The paragraph as stated is factually correct.  The plaintiffs provide no citation to support in the record or elsewhere for their partial denial/objection.  For both reasons, the paragraph is deemed admitted.

### III.     Discussion

The complaint in this action alleges that Rosie used excessive force in violation of the state and federal constitutions, that Peck and the Town of Farmington violated both constitutions, and that all three caused the wrongful death of Crowley-Smilek.    Amended Complaint (ECF No. 29), Counts One - Nine.

### A.   Qualified Immunity

The defendants argue that Rosie's actions were protected by the doctrine of qualified immunity.    Defendants' Memorandum in Support of Their Motion for Summary Judgment ("Defendants' Motion") (ECF No. 47) at 4-9.    The plaintiffs contend that the doctrine does not apply under the facts of this case.    Plaintiffs' Motion for Summary Judgment and Memorandum of Law in Support Thereof ("Plaintiffs' Motion") (ECF No. 44) at 11-18.

The First Circuit instructs federal trial courts to evaluate claims of qualified immunity with respect to excessive force claims with "a trifurcated inquiry":

> We ask, first, whether the plaintiff has alleged the violation of a constitutional right.  If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation.  Finally, we ask whether an objectively reasonable official would have believed that the action taken or omitted violated that right.

*Acevedo-Garcia v. Monroig*, 351 F.3d 547, 563-64 (1st Cir. 2003) (citation and internal quotations marks omitted).    The same standard applies to excessive force claims based on the Maine state constitution.    *Judson v. Mount Desert Police*, Civil No. 06-124-B-W, 2007 WL 2344969, at *10 (D. Me. Aug. 10, 2007).

"Qualified immunity shields an officer from suit when []he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances []he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citation omitted).  "For example,

'[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed.'" *Asociación de Periodistas de Puerto Rico v. Mueller*, 680 F.3d 70, 81 (1st Cir. 2012) (citation omitted).  The constitutional prohibition against the use of excessive force has long been clearly established.  *See, E.g., Morelli v. Webster*, 552 F.3d 12, 23-24 (1st Cir. 2009).  Thus, the question is whether the "use of excessive force constituted the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made." *Id*. at 24.

"To establish a Fourth Amendment excessive force violation, the plaintiffs must show that the defendant[] employed force that was unreasonable under the circumstances." *Asociación de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 59 (1st Cir. 2008).  Among the factors which the court is to consider when determining whether the degree of force was reasonable are the severity of the crime at issue, the threat to the safety of the officer or others, and whether the plaintiff was fleeing or otherwise resisting arrest.  *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

In this case, the plaintiffs assert that qualified immunity is unavailable because Crowley-Smilek did not pose an immediate threat to Rosie at the time when Rosie shot him. Plaintiffs' Motion at 13.  This is demonstrated, they contend, by the undisputed fact that "Rosie was able to keep the cruiser safely between himself and Justin." *Id*.  They also point out that Rosie expected Neil, who he knew was in the building next to the cruiser, and others to come to his assistance; he gave no voice commands to Crowley-Smilek after his initial question; and  Crowley-Smilek was not committing a crime.  *Id*. at 13-15.

The defendants take the position that the plaintiffs will not be able to establish that Rosie violated any of Crowley-Smilek's constitutional rights.  Defendants' Motion at 5.  This

approach also requires consideration of reasonableness: whether Rosie's conduct was "objectively reasonable" under the circumstances. *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994). The defendants point out that the availability of other means by which to subdue a person does not, by itself, establish that an officer's actions were unreasonable. *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007).

Both sides of this dispute cite *Roy* and *Norton v. City of South Portland*, 831 F.Supp.2d 340 (D. Me. 2011), in support of their respective positions. Plaintiffs' Motion at 16-17; Defendants' Motion at 7. Neither case is dispositive. In *Roy*, the plaintiff, who had been drinking, was found by two police officers responding to a domestic disturbance call on the ground behind his house. 42 F.3d at 693. He refused to acknowledge the reading of a *Miranda* warning or to accept service of a summons from a third officer, who pushed the summons into the plaintiff's pocket. *Id.* The plaintiff then stated, "I'll show you," entered his house, and returned to the yard with a steak knife in each hand. *Id.*

The officers drew their guns as the plaintiff advanced, flailing his arms. The officers retreated, repeating their warnings and trying to distract and disarm the plaintiff. *Id.* The plaintiff then make a kicking-lunging motion toward two officers, one of whom shot the plaintiff twice. *Id.* Noting that "the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases[,]" *id.* at 695, the First Circuit upheld the district court's grant of summary judgment in favor of the officer who shot the plaintiff. *Id.* at 695-96. The court found it important that the plaintiff was armed, tried to kick and strike at the officers and disobeyed repeated instructions to put down the knives, as well as the fact that the officers had reasons for thinking the plaintiff capable of assault. *Id.* at 696. The only

similar facts in the case at hand are that Crowley-Smilek was armed with a knife and that he was running toward Rosie immediately before Rosie fired his weapon.[10]

In *Norton*, the police were contacted on August 22, 2008, by a psychiatrist who had been treating the plaintiff's decedent.  831 F.Supp.2d at 348.  The psychiatrist asked that the plaintiff's decedent ("Norton") be taken into protective custody because he was suicidal and had attempted to buy a gun.  *Id*.  Norton's employer also contacted the police, expressing concern for his well-being.  *Id*.  Officers spent three hours unsuccessfully trying to make contact with Norton.  *Id*.  On the next day, a psychiatric nurse contacted the police to express concern that Norton was still intent on committing suicide when she spoke with him that morning.  *Id*.  After an hour and a half of negotiation, Norton came out of his residence and was transported to a hospital for a psychiatric evaluation.  *Id.*

At 9:30 p.m. the next day, Norton's father called police and informed them that Norton had checked himself out of the hospital and returned home, where statements he made to his father led the father to believe that Norton was about to attempt suicide.  *Id*.  The police dispatcher spoke with Norton, who said that police would have to come into his residence if they wanted to speak to him.  *Id*. at 349.  During the call, the dispatcher heard a female speaking to Norton in a "shaky" voice.  *Id*.  Several officers went to Norton's residence; a cruiser was parked so that it blocked the driveway.  *Id*.  For four hours, the officers "maintained a constant and increasing presence" at the residence. *Id*.

---

[10] The plaintiffs assert  that Rosie "did not confirm" that Crowley-Smilek was armed, "could not say Justin was holding a knife at the time he fired several shots at him[,]" and that Rosie "did not see whether Justin was holding a knife when he fired the shots[,]" and then proceed to aver that Crowley-Smilek was "unarmed."  Plaintiffs' Motion at 7, 13, 16.  Reasonableness in such circumstances is not so closely cabined.  There is no dispute that Rosie saw Crowley-Smilek take a knife out of his pocket before the circling of the cruiser began.  In the absence of any evidence that Rosie knew that Crowley-Smilek had discarded the knife, it was reasonable for him to assume that Crowley-Smilek continued to hold the knife in his hand throughout the encounter, regardless of where the knife was found afterward.

At approximately 10:43 p.m., a police detective called Norton's father, who informed the detective that Norton was drinking and that, to his knowledge, Norton did not have a gun. *Id.* By this time, Norton's employer had also called the police to inform them that Norton had called her and told her that he was going to commit suicide by going outside his residence with "something in his hands" that would force the police to shoot him. *Id.* At approximately 11:15 p.m. Norton agreed to come out of the residence with the female, a co-worker whom police thought Norton might be holding hostage, to be patted down for weapons, and to sit in a car and talk with the police negotiator. *Id.* at 351. However, he changed his mind and demanded that the negotiator come into the resident to talk, which was not allowed by police department policy. *Id.*

Norton's father called the police again at 12:20 a.m. to advise them that Norton had called him 30 minutes earlier and told him that he was going to "get violent" with the police outside his residence. *Id.* at 352. At 1:40 a.m., the coworker came out of Norton's residence. *Id.* She said that Norton had a knife and was threatening himself, going so far as to cut his neck with the knife. *Id.* at 353. At 1:41 a.m., Norton called the police negotiator, advising him that Norton was going to come at the police, armed with knives, and that "this was it." *Id.* After the call ended, an officer began using a PA system, asking Norton to come out the front door, as the coworker had done. *Id.* at 354.

One minute later, Norton suddenly came out through a lower level door at the rear of the residence. *Id.* An officer who had been stationed at the rear of the house saw a large knife in Norton's left hand. *Id.* Another officer shined his flashlight on Norton, revealing that he had a smaller knife in his right hand. *Id.* Norton made a gesture, circling with his fingers on his chest. *Id.* Officers at the back of the house commanded Norton to drop the knife. *Id.* at 355. After a

brief interval, Norton resumed moving forward, holding the knives but not throwing, thrusting, or lunging with them.  *Id*. at 356.

One of the officers, perceiving Norton to be moving in the direction of another officer, coming within 15 feet of his position, fired at Norton.  *Id*.  At the same time, another officer fired a bean bag shotgun at Norton.  *Id*. at 356-57.

The court held that the officer who fired his shotgun at Norton was entitled to qualified immunity, because, "[g]iven this totality of circumstances, any reasonable officer on the scene would necessarily have perceived [Norton] as acting expressly in accordance with his stated plan, which was to 'get violent' and do whatever was necessary to make officers use deadly force against him."  *Id*. at 363-64.   In the case at hand, which involved a much shorter time frame, Crowley-Smilek said nothing other than "You better kill me," and did not take a hostage or otherwise involve a third person.  No one had told Rosie that Crowley-Smilek intended to instigate a violent response from police.  No multi-hour standoff preceded the shooting, and the police apparently had no history with Crowley-Smilek.

In another First Circuit case cited by the defendants, *Berube v. Conley*, 506 F.3d 79 (1st Cir. 2007), the court reiterated that "the Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present."  *Id*. at 83 (citing *Roy*, 42 F.3d at 695).  So long as the cruiser remained between Rosie and Crowley-Smilek, this standard might have kept Rosie from invoking the protection of the doctrine of qualified immunity.  However, the undisputed fact in this case is that, after Rosie stepped away from the protection of the cruiser, Crowley-Smilek began sprinting toward him.  Plaintiffs' SMF ¶¶ 110-11; Defendants' Responsive SMF ¶¶ 110-11; Defendants' SMF ¶ 61; Plaintiffs' Responsive SMF ¶ 61.

At that point, a reasonable officer in Rosie's position would have believed that Crowley-Smilek was armed with a knife and that he intended to cause serious physical harm to Rosie.  If, like the officer in *Berube,* Rosie "made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation[,]" 506 F.3d at 85, he may be entitled to the protection of qualified immunity.  *Id.*   If Rosie fired two more shots after Crowley-Smilek lay on the ground, as Heckbert testified, Defendants' Additional SMF ¶ 14; Plaintiffs' Reply SMF ¶ 14, *Berube* extends the protection to those shots as well.  "While one might regret [the officer's] failure to stop shooting as soon as Berube went down, immunity encompasses 'mistaken judgments.' *Malley [v. Briggs]*, 475 U.S. [335,] 343 [1986].

The plaintiffs contend that *Berube* does not apply because "a police officer who resorts to deadly force in self defense violates the Fourth Amendment if he unreasonably creates the circumstances where the use of deadly force becomes necessary."  Plaintiffs' Object[ion] to the Defendants' Motion for Summary Judgment ("Plaintiffs' Opposition") (ECF No. 51) at 19. Rosie did so, they assert, when he moved away from the protection of the cruiser.  They cite cases from three other jurisdictions in support of this argument, to which the defendants do not respond.

The first case cited by the plaintiffs, *Bella v. Chamberlain*, 24 F.3d 1251, 1256 & n.7 (10th Cir. 1994), provides little helpful guidance for the instant case, discussing in the cited portion only which events, in terms of relative time, may be taken into account in determining reasonableness of a seizure.  In the second cited case, *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993), the court held that a police officer cannot be granted qualified immunity for the use of deadly force if "his own unreasonable action prompted the danger he faced[,]" *id.*, but it also held that an officer who jumped to a position in front of a stolen car that was already moving

17

at a high rate of speed was not protected by qualified immunity. *Id.* at 232, 233-34. "The essential dispute, therefore, concerns whether [the officer] moved from behind the pole before or after the [car] started forward." *Id.* at 234.

In the instant case, it appears that Crowley-Smilek was already moving around the cruiser, as was Rosie, before Rosie chose to "move out away from the cruiser to take up a firing position." Plaintiffs' SMF ¶ 110; Defendants' Responsive SMF ¶ 110. Rosie's reasons for doing so are not recounted in the record and appear to me to be significant with respect to the qualified immunity calculus. The amount of time spent circling the cruiser, and the time elapsed since Rosie's call for backup, before Rosie moved away from the cruiser are also relevant but missing facts. On the current record, I cannot determine whether Rosie's action so contributed to the danger he faced that qualified immunity is unavailable.

In the third case cited by the plaintiffs, *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1501 (11th Cir. 1985) (abrogated on other grounds, *Nolin v. Isbell*, 207 F.3d 1253, 1255-56 (11th Cir. 2000)), the court upheld the trial court's ruling that a police officer who shot and killed the plaintiff's decedent could not avoid liability on a substantive due process claim when his belief that his life was in danger arose from his own improper use of his official power. 774 F.2d at 1501. There is no substantive due process claim in this case, and Rosie did not physically harm Crowley-Smilek or otherwise improperly use his official power against him before the shooting.

On the present record, I am unable to determine whether Rosie is protected by qualified immunity on Count One of the amended complaint, which alleges use of excessive force under the Fourth Amendment. Amended Complaint ¶¶ 27-32. I can only revisit this issue after the evidence has been presented at trial.[11]

---

[11] The plaintiffs make much of their contention that Rosie "has less lethal options available to him" at the time of the shooting. Plaintiffs' Opposition at 1, 13. The fact that other means to subdue an individual were available does not

In Count Two, the amended complaint alleges the use of excessive force under Article 1, Section 5 of the Maine Constitution. *Id*. ¶¶ 33-35. Such a claim must be brought under the Maine Civil Rights Act. 5 M.R.S.A. § 4682(1-A). Claims of excessive use of force brought under the Maine Civil Rights Act are resolved under the same rubric as federal excessive force claims. *Dimmit v. Ockenfels*, 220 F.R.D. 116, 123, 125 (D. Me. 2004). Accordingly, Rosie is not entitled to summary judgment on Count Two.

This conclusion does not mean that the plaintiffs are entitled to summary judgment on these counts. There are many disputed material facts in this record that are relevant to the ultimate decision on those claims, not the least of which is the plaintiffs' assertion that Crowley-Smilek was "unarmed" at the time of the shooting and their suggestion that Rosie knew this. Even interpreting the undisputed facts favorably to the plaintiffs, along with all reasonable inferences, the plaintiffs do not meet the summary judgment standard.

### B. Assault

Count Three of the amended complaint alleges that Rosie assaulted Crowley-Smilek. Amended Complaint ¶¶ 36-38. The plaintiffs state that they "do not intend to proceed on the state tort claim of assault and will voluntarily dismiss[] that claim." Plaintiffs' Opposition at 22 n.3. Because at this post-summary judgment stage of the case, unilateral voluntary dismissal of a claim is not available, Fed. R. Civ. P. 41(a), I dismiss Count Three with prejudice.

### C. Wrongful Death

Counts Eight and Nine allege that all of the defendants wrongfully caused the death of Crowley-Smilek, who underwent conscious pain and suffering before his death. Amended

---

mean that an officer's choice to use deadly force must necessarily have been unreasonable and cannot be protected by qualified immunity. *See, e.g., Berube*, 506 F.3d at 85.

Complaint ¶¶ 59-64.  They invoke the Maine wrongful death statute, 18-A M.R.S.A § 2-804(b) and (c).

The defendants take the position that these claims are subject to the Maine Tort Claims Act, which confers immunity from civil liability on government employees who are performing discretionary functions, intentional acts, or omissions within the course and scope of their employment.  Defendants' Motion at 9-10; *see* 14 M.R.S.A. § 8111(1).  A law enforcement officer's use of force is a discretionary act.  *Dimmitt*, 220 F.R.D. at 125.  Claims brought under the Maine wrongful death statute are subject to the terms of the Maine Tort Claims Act.  *Jackson v. Town of Waldoboro*, 751 F.Supp.2d 263, 276 (D. Me. 2010).

The plaintiffs take the position that liability on any of Counts One through Seven automatically establishes liability under the Wrongful Death Act.  Plaintiffs' Motion at 26-27.  In their reply brief, they assert that the immunity provisions of the Maine Tort Claims Act do not apply to state-law wrongful death claims arising out of violation of federal civil rights.  Plaintiffs' Reply to Defendants' Opposition to the Plaintiff's Motion for Summary Judgment ("Plaintiff's Reply") (ECF No. 56) at 10-11.  The only authority they cite for this proposition is the fact that the Maine Law Court has applied the statute of limitations created by the Wrongful Death Act to claims brought under 42 U.S.C. § 1983.  *Id*. at 11-12.

This court's own precedence, reiterated in *Town of Waldoboro,* provides controlling guidance.  The plaintiffs' assertion that a finding of liability on their excessive force claim will automatically require judgment in their favor on this claim as well is incorrect.  The standard applicable here is the following: "[A] police officer's use of force is subject to absolute immunity absent conduct so egregious as to clearly exceed any discretion the officer could have possessed

under the circumstances." *Town of Waldoboro*, 751 F.Supp.2d at 276 (citation and internal punctuation omitted).

The Maine Law Court has instructed that the reasonableness inquiry necessary in an excessive force case where a defense of qualified immunity is asserted is the equivalent of the absolute scope of discretion inquiry with respect to a claim under the Maine Tort Claims Act. *Martin v. Somerset County*, 387 F.Supp.2d 65, 82 (D. Me. 2005).  Therefore, as to Rosie, the defendants' motion for summary judgment on Counts Eight and Nine must be denied.  Remaining questions of fact direct denial as well of the plaintiffs' motion for summary judgment on these counts to the extent that they are asserted against Rosie.

With respect to the defendant town, however, the Maine Tort Claims Act confers absolute immunity against the wrongful death claims.  14 M.R.S.A. § 8103(1).  The defendants' motion for summary judgment is accordingly granted as to the town on Counts Eight and Nine. Neither side discusses any basis for defendant Peck's liability under the Maine Tort Claims Act and the allegations in this action, confining their briefs to broad, all-or-nothing arguments encompassing all of the defendants.  I will revisit this issue after addressing the other claims asserted against Peck by the plaintiffs.

### D.   Supervisory Liability - Peck

Count Four of the amended complaint alleges that defendants Peck and the Town of Farmington are liable for their failure to train and supervise Rosie properly, thereby violating the Fourth Amendment to the United States Constitution.   Amended Complaint ¶¶ 39-46.  Count Five makes the same allegations under the Maine Civil Rights Act.  *Id.* ¶¶ 47-49.

There is no *respondeat superior* or vicarious liability under 42 U.S.C. § 1983, the procedural vehicle by which Count Four's claims are presented.  *City of Canton v. Harris*, 498

U.S. 378, 385 (1989).  The plaintiffs limit their claim to assertions that Peck failed to train and supervise Rosie appropriately and imposed an unconstitutional policy on the use of force. Plaintiffs' Motion at 18-22, 24-26.  They charge the town with failure to train and adoption of an unconstitutional policy on the use of force.  *Id*. at 22-26.

The plaintiffs may prevail on these claims against Peck only if they establish that Rosie violated Crowley-Smilek's constitutional rights and that Peck's action or inaction was affirmatively linked to that action in that it could be characterized as encouragement, condonation, acquiescence, or gross negligence amounting to deliberate indifference.  *Norton*, 831 F.Supp.2d at 364-65.  The plaintiffs address only an alleged lack of training of Rosie in their discussion of this claim, Plaintiffs' Motion at 18-22; therefore, I need not consider any alleged failure to supervise as a basis for recovery against Peck.

Inadequate training is the basis for liability under section 1983 only where it amounts to deliberate indifference to the rights of people with whom police come into contact.  *City of Canton*, 498 U.S. at 388.  The plaintiff must establish reckless or callous indifference on the part of the supervisor.  "A supervisor . . . must have actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights to be deemed deliberately indifferent."  *Norton*, 831 F.Supp.2d at 365.  The plaintiffs recite the ways in which they believe Rosie was inadequately trained, Plaintiffs' Motion at 20-22, but that is not enough.

Assuming *arguendo* that a constitutional violation by Rosie did occur, which is the necessary predicate for this claim, the plaintiffs have not shown how any instance of allegedly inadequate training necessarily led to the shooting, for example, that allowing an officer, already admittedly locally trained to a higher standard than that required by the state, Defendants' SMF

¶¶ 91, 101-02, Plaintiffs' Responsive SMF ¶¶ 91, 101-02, to begin patrol before taking the basic course at the Maine Criminal Justice Academy will result in use of excessive force. Some evidence beyond the plaintiffs' assertion, or the mere fact of the shooting,[12] is necessary.

All of the evidence of allegedly inadequate training proffered by the plaintiffs concerns only Rosie. They assert that his training was inadequate because Peck cleared him for duty "when he showed a history of subpar training performances, was never sent to the Basic Law Enforcement Training Program at the Maine Criminal Justice Academy,[13] answered test questions on the use of force incorrectly, and . . . never received any training on dealing with emotionally disturbed persons."[14] Plaintiffs' Opposition at 23. They cite no authority for the proposition that any of these acts or omissions is sufficient to support a finding of deliberate indifference to the constitutional rights of individuals whom Rosie was likely to encounter in the course of his duties. It is a requirement of the cause of action for supervisory liability under the circumstances of this case that the plaintiff show an affirmative connection between the supervisor's deliberate indifference and the subordinate's violative act. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).

---

[12] The plaintiffs assert that "[a] pattern of wide-spread abuse is not necessary to establish supervisory liability[]" and that "[a] single constitutional violation can support a claim for failure to train where the violation of constitutional rights is a 'highly predictable consequence' of the failure to train." Plaintiffs' Reply at 9. The authority that they cite for this proposition, *City of Canton*, 489 U.S. at 390 n.10, says only that the failure to train officers who will be armed in the constitutional limitations on the use of deadly force "could properly be characterized as 'deliberate indifference' to constitutional rights." The language "highly predictable consequence" does not appear in the footnote. The plaintiffs do not contend that Rosie was not trained in the constitutional limitations on the use of deadly force.

[13] At the time of the shooting, Rosie was enrolled in the next available bi-annual session of the basic course at the Criminal Justice Academy, which he attended beginning in January 2012, and successfully completed. Defendants' SMF ¶¶ 98-100, Plaintiffs' Responsive SMF ¶¶ 98-100.

[14] The paragraph of their "additional statement of facts" cited by the plaintiffs in support of this assertion actually states: "Officer Rosie did not receive any training outside of the two situations encountered during his field training on how to handle emotionally disturbed or suicidal persons." Plaintiffs' Additional SMF ¶ 49. The defendants deny this paragraph, stating that the police department had a procedure regarding this issue and that Rosie "was confronted with emotionally disturbed people during his field training." Defendants' Reply SMF ¶ 49.

The necessary causal link may be found if the supervisor knew of, overly or tacitly approved of, or purposely disregarded the conduct. *Id*. The plaintiffs here have proffered no evidence of any of these alternatives. "A causal link may also be forged it there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." *Id*. Again, the plaintiffs make no attempt to provide evidence of this alternative. Significantly, "isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference." *Id*. Mere negligence is insufficient, and gross negligence is only enough "if it is causally connected to the actions that work the direct constitutional injury." *Id*.

In the instant case, a "history of subpar training performances" cannot reasonably be said to be causally connected to the shooting. In addition, when unacceptable performance occurs, whether during training or while on the job, responding through individualized discipline or corrective action should cut the causal connection. The plaintiffs have not shown that Rosie's "subpar training performance" was not disciplined or corrected during his training. The same is true of any incorrect answers that Rosie may have given on tests.

Case law provides guidance with respect to the lack of specific training for dealing with emotionally disturbed individuals as deliberate indifference sufficient to allow supervisory liability to attach. In *Lopez v. Lynch*, Civil Action No. 12-03167 (JAP), 2014 WL 4259132 (D. N.J. Aug. 28, 2014), the plaintiffs alleged that a lack of training "to effectively manage a suicidal, emotionally disturbed person" by the defendant chief of police and police department led to the shooting death of their decedent. *Id*. at *2, *6. Their expert witness testified that the police were not trained specifically on how to deal with an emotionally disturbed person. *Id*. at *7. The court rejected this evidence as a basis for supervisory liability, finding the testimony "speculative as it

assumes that the Decedent was in fact an emotionally disturbed person and in any event, it is not

enough to establish that the injury could have been avoided by more or different training."  *Id.*

In *Morrison v. Board of Trustees of Green Township*, 529 F.Supp.2d 807 (S.D. Ohio

2007), the plaintiffs provided evidence that the defendant police department did not provide

regular training to officers regarding the proper reaction to emotionally disturbed persons and

expert opinion that this was a proximate cause of the plaintiff's injuries.  *Id.* at 823.  The court held

as follows:

> Taken together, the officers' testimony that the Defendant Departments
> do not provide specialized training to the officers regarding [a call for
> response to a psychiatric emergency] and [the expert's] opinion that this
> lack of regular training on the subject caused Plaintiffs' injuries are
> insufficient . . . to create a genuine issue for trial.  Plaintiffs' proffered
> proof does not demonstrate either a history of constitutional rights
> violations or an obvious likelihood that constitutional rights violations
> were likely to result absent better training.  Therefore, Plaintiffs have
> failed to demonstrate a triable issue of fact that any inadequacies in
> training were the result of the [defendant police departments'] deliberate
> indifference to the rights of the Plaintiffs.

*Id.* at 823-24 (citation and internal punctuation omitted).  In the instant case, the plaintiffs do not

include in their statements of material facts any opinion testimony or other evidence to substantiate

the contention that the limited training received by Rosie in this respect created an obvious

likelihood that Rosie would commit a violation of Crowley-Smilek's constitutional rights.

None of the instances of allegedly causative failures in Rosie's training proffered by

the plaintiffs meets the applicable standard articulated by the First Circuit: "[S]upervisory liability

under a theory of deliberate indifference will be found only if it would be manifest to any

reasonable official that his conduct was very likely to violate an individual's constitutional rights."

*Maldonado v. Fontanes*, 568 F.3d 263, 275 (1st Cir. 2009) (citation and internal punctuation

omitted).  Nor have the plaintiffs established that Peck knew of a grave risk of harm to individuals

as a result of any of these alleged failures *and* failed to take easily available measures to address that risk.  *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998).  The plaintiffs' submission ignores the second element of this test entirely.

Defendant Peck is entitled to summary judgment on Counts Four and Five.

### E.   Municipal Liability

Counts Four and Five are also asserted against the Town of Farmington.  Amended Complaint ¶¶ 39-49.  Count Six is asserted only against the town and alleges a policy or custom that caused Rosie's deprivation of Crowley-Smilek's constitutional rights.  *Id*. ¶¶ 50-55.  Count Seven alleges that the town is directly liable for the deprivation of those rights.  *Id*. ¶¶ 56-58.

Count Seven can only be read to allege direct municipal liability for any constitutional violation committed by Rosie.  That is an assertion of vicarious liability or an invocation of the doctrine of *respondeat superior*.  The plaintiffs do not address this claim separately in their submissions.  Such claims are not allowed under applicable law.  *City of Canton*, 489 U.S. at 385.  Therefore, the town is entitled to summary judgment on Count Seven.

With respect to Counts Four and Five, my decision to enter summary judgment for defendant Peck, for the reasons discussed above, directs entry of summary judgment for the town as well, primarily because the plaintiffs argue only that the town is liable on these claims "[b]ecause Chief Peck is liable as a matter of law" on these counts.  Plaintiffs' Motion at 23.  I have determined that defendant Peck is not in fact liable on these counts.

Count Six is based on allegations that the town had a policy or custom not to train its police officers on the proper use of force, including deadly force, or in dealing with persons with mental illness or in a crisis situation before placing them on duty.  Amended Complaint ¶ 51.  Specifically, the plaintiffs fault the town for failing to "require probable cause that a person was

an imminent threat to use deadly force before justifying an officer[']s use of deadly force."
Plaintiffs' Motion at 24.  The defendants do not respond to this argument, but the court must
nevertheless address the plaintiffs' motion for summary judgment on this count.  *Wheeler v.
Olympia Sports Ctr., Inc.*, No. 03-265-P-H, 2004 WL 2287759, at *9 (D. Me. Oct. 12, 2004).

The parties agree that the following use of force policy is the policy language at
issue:

> An officer is justified in using deadly force only when the officer
> reasonably believes such force is necessary: For self-defense . . . from
> what the officer reasonably believes is the imminent use of unlawful
> deadly force[.]

Defendants' SMF ¶ 164; Plaintiffs' Responsive SMF ¶ 164.  In support of this argument, the
plaintiffs cite, Plaintiffs' Motion at 25, only language from a Supreme Court opinion discussing
qualified immunity, where the Court said that where an officer has probable cause to believe that
the suspect poses a threat of serious physical harm, he or she is entitled to qualified immunity for
the use of deadly force to prevent the suspect's escape.  *Brosseau v. Haugen*, 543 U.S. 194, 197-
98 (2004).  That holding does not address the requirements for a municipal policy on the use of
deadly force.

A municipality's policy of inadequately training its police can serve as a basis for
liability under section 1983 only if that failure amounts to deliberate indifference to the rights of
persons with whom the police come into contact.  *City of Canton*, 498 U.S. at 388.  Deliberate
indifference will be found where the municipality fails to provide adequate training
notwithstanding an obvious likelihood that inadequate training will result in the violation of
constitutional rights.  *Whitfield v. Meléndez-Rivera*, 431 F.3d 1, 9-10 (1st Cir. 2005).  A plaintiff
must prove that the deficiency in training actually caused an officer's indifference to the public's
constitutional rights.  *Id*.  The plaintiff must establish that a specific failure in training was at least

a partial cause of the alleged injury.  *Id.*  Ordinarily, an unconstitutional municipal policy cannot be inferred from a single use of excessive force.  *Landrigen v. City of Warwick*, 628 F.2d 736, 747 (1st Cir. 1980).  A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.  *Connick v. Thompson,* __ U.S. __ , 131 S.Ct. 1350, 1359 (2011).

In the only case I found in which the specific argument made by the plaintiffs in this regard was raised, the court rejected it.  *E.H. v. City of Miramar*, No. 13-60235-CIV, 2015 WL 1284091, at *13 (S.D. Fla. Mar. 13, 2015).  I find the reasoning of the court in that opinion to be persuasive.  In addition, the plaintiffs have demonstrated no reason to exempt the policy of the defendant town in this case from the general requirements set out above, which their proffered evidence does not satisfy even with the benefit of reasonable favorable inferences,.  The town is entitled to summary judgment on Count Six.

### IV.    Conclusion

For the foregoing reasons, (1) the plaintiffs' motion for summary judgment is **DENIED**, and (2) the defendants' motion for summary judgment is **GRANTED** as to all claims asserted against defendants Jack Peck and the Town of Farmington, and to Counts Eight and Nine as asserted against defendant Ryan Rosie, and otherwise **DENIED.**  Remaining for trial are Counts One and Two against Rosie.

Dated this 30th day of September, 2015.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

28